[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal to the Superior Court from the action of the Planning and Zoning Commission of the Town of Greenwich approving the site plan/special permit application #1440.3 to add 29 units of assisted living to the existing Greenwich Woods Limited Partnership facility at 1165 King Street, Greenwich, CT, in the RA-4 zone.
The defendant, Planning and Zoning Commission of the Town of Greenwich (Commission) held a public hearing on October 28, 1997, after due notice, on the application of Greenwich Woods Limited Partnership (Woods) for 29 units of assisted living. The Commission approved the application in a 10 page, detailed decision, dated December 9, 1997. The decision letter contained conditions and modifications (Return of Record, Exhibit 52). Notice of the decision was duly published on December 17, 1997 in the Greenwich Time, a newspaper of general circulation in the Town of Greenwich. Paul J. Antonik, as the immediate adjacent property owner, filed the subject appeal in a timely manner.
 PLAINTIFF'S CLAIMS
The plaintiff's complaint alleges that the action taken by the commission was improper for three reasons:
(1) The applicant's assisted living facilities do not fall within one of the enumerated special permit uses in the RA-4 zone, § 6-94 (b)(1) Building Zone Regulations of the Town of Greenwich (Regulations): "Hospitals; clinics; nursing homes; CT Page 7454 homes for the aged; sanitariums; convalescent homes, or other health care facilities for the elderly. . . ."
(2) By adding 29 residential units to the existing nursing home facility, Woods was in effect building a multi-family apartment in an area zoned for one house per four acre lot. The 29 units of assisted living would be located on a lot slightly more than 4 acres. The Plaintiff claims that this intense use would violate the established rural and residential character of the RA-4 zone.
(3) There was inadequate information in the record to satisfy § 6-141 (b)(1); § 6-205 Note 7(a); and § 6-205 Note 7(a)(1) of the Regulations, which require that any change in a non-conforming use must not be "more detrimental to the neighborhood than the existing use." Regulations § 6-141 (b)(1), entitled Non-Conforming Uses, provides: "(1) Change. A non-conforming building, lot or use, or the building in which a non-conforming use occurs may be changed to another non-conforming use only if after application for Special Permit, the Commission finds that said change meets the standards of Sections 6-15 and 6-17 and also finds said changed use is not more detrimental to the neighborhood than the existing use."
Memoranda of law were filed by the plaintiff and both defendants. The Commission, acting by the law department of the Town of Greenwich, adopted the memorandum of defendant Woods. The defendant Commission, is a combined planning commission and zoning commission. At the February 2, 1999 trial, Paul J. Antonik, testified as to aggrievement. The Return of Record was perfected by the Commission by filing with the court Special Permit/Site Plan #1440.1, a 1986 application of Woods, which was before the Commission. There was no objection to the inclusion of this item in the Return of Record and the court marked the documents as defendants' Exhibit 1. No further evidence was offered. After oral argument, the matter was submitted on the Return of Record and briefs filed. No post trial memoranda were requested or filed.
 AGGRIEVEMENT
The plaintiff, Paul J. Antonik, testified that he was the owner of the premises immediately adjacent to the southerly border of the subject premises on which the 29 units of assisted CT Page 7455 living was proposed. He was the owner as of the date of the application in October, 1997 and remained the owner consistently through the date of trial. General Statutes § 8-8 (b) provides: "any person aggrieved by any decision of a board may take an appeal to the superior court. . . ." "Pleading and proof of facts that constitute aggrievement are essential prerequisites to the trial court's subject matter jurisdiction over an administrative appeal." New England Rehabilitation Hospital ofHartford, Inc. v. Commission on Hospitals and Health Care,226 Conn. 105, 120 (1993). The burden of demonstrating aggrievement rests with the plaintiff. Id., 121; see also Hughes v. TownPlanning Zoning Commission, 156 Conn. 505, 509 (1968); Londonv. Planning Zoning Commission, 149 Conn. 282, 284 (1962). General Statutes § 8-8 governs planning commission appeals. Section 8-8 (1) allows an appeal to be brought by persons aggrieved by the agency's decision or by "any person owning land that abuts or is within a radius of one hundred feet of any portion of the land involved in any decision of the Board." This type of aggrievement has been referred to as "statutory aggrievement." Pierce v. Harwinton Zoning Board of Appeals,7 Conn. App. 632, 636 (1986); Nick v. Planning and ZoningCommission, 6 Conn. App. 110, 111 n. 3 (1986). This court finds that the plaintiff, Paul J. Antonik, was, on October 1997, and is now, the immediate abutting land owner to the south. The court finds that the plaintiff is statutorily aggrieved. "Abutting landowners or land owners within a radius of one hundred feet of the land involved in any decision of the zoning board are considered automatically aggrieved and have standing to appeal a decision of a zoning board without having to prove aggrievement."Smith v. Planning Zoning Board, 203 Conn. 317, 321 (1987); see also Point 0' Woods Assn., Inc. v. Zoning Board of Appeals,178 Conn. 364, 366 (1979).
 JURISDICTION
In order to take advantage of a statutory right to appeal from the decision of the local zoning agency, there must be strict compliance with the statutory provisions that create that right. Simko v. Zoning Board of Appeals, 206 Conn. 374, 377
(1988). These provisions are mandatory and jurisdictional in nature. Id. Accordingly, the failure to comply subjects the appeal to dismissal. Id. The court has examined the statutes and regulations in question and determines that the appeal filed by the plaintiff is timely and complied with the statutory requirements. The plaintiff's complaint does not allege that the CT Page 7456 Commission erred in any of its jurisdictional obligations in granting the application to Woods. Therefore, this court concludes that it has subject matter jurisdiction to decide the plaintiff's appeal.
 SCOPE OF JUDICIAL REVIEW OF SPECIAL PERMITS
Defendant Woods filed a combined site plan application and a special permit application, seeking approval for 29 units of assisted living in a new building to be constructed on property that it owned at 1165 King Street, Greenwich, CT. The proposed building was immediately adjacent to a 217 bed critical care/intermediate care nursing home owned and operated by defendant Woods. The Special Permit section of the Regulations is § 6-17. This court has been asked to review both the special permit application and the site plan application approval.
When an agency acts upon a special permit application, its actions are governed by existing provision of its own regulations. A.P. W. Holding Corp. v. Planning and Zoning Board,167 Conn. 182, 186 (1984). In hearing an application for a special permit, a zoning commission acts in an administrative capacity. Sheridan v. Planning Board, 159 Conn. 1, 16, (1969);Maher v. Town Planning Zoning Commission, 154 Conn. 420, 422
(1967); A.P. W. Holding Corp. v. Planning Zoning Board, supra,167 Conn. 186. A commission's authority to act regarding special permits is by General Statutes § 8-3c. Section 8-3c (b) provides in part: "The zoning commission or combined planning and zoning commission of any municipality shall hold a public hearing on an application or request for a special permit or special exception, as provided in section 8-2, and on an application for a special exemption under section 8-2g." The Greenwich building zone regulations contain standards for issuing special permits. Greenwich Building Zone Regulations § 6-19 and 6-20.
The zoning regulations must contain standards for the issuance of special permits, and where those standards exist, the commission must adhere to them and cannot deny an application that conforms to the criteria in the regulations. DeMaria v.Planning and Zoning Commission, 159 Conn. 534. 540 (1970); Farinav. Zoning Board of Appeals, 157 Conn. 420, 422 (1969); Powers v.Common Council, 154 Conn. 156, 160 (1966). The Commission's function is to determine (1) if the applicant's proposed use of the property is expressly permitted under the Commission' s regulations; (2) whether the standards in the relevant zoning CT Page 7457 regulations are satisfied; and (3) whether any conditions are necessary to protect public health, safety, convenience and property value, as provided in General Statutes § 8-2. HousatonicTerminal Corp. v. Planning Zoning Board, 168 Conn. 304, 307
(1975); A.P. W. Holding Corp. v. Planning Zoning Board, supra,167 Conn. 185. The Commission is required under General Statutes8-3c to give reasons for its actions.
On appeal, the Superior Court determines whether the reasons assigned are reasonably supported by the record and whether they are pertinent to the consideration that the agency is required to apply under the zoning regulations. Holt-Lock, Inc. v. Zonina Planning Commission, 161 Conn. 182, 190 (1971); Spectrum ofConnecticut, Inc. v. Planning Zoning Commission,13 Conn. App. 159, 163-64 (1988). If the commission gives reasons for its actions, the court should not go behind the official collective statement of the commission to find other reasons which might influence some or all of the members of the commission to reach the commission's final collective decision. De Maria v. Planning Zoning Commission, supra, 159 Conn. 541. There must be facts in the record to support the decisions. Daughters of St. Paul, Inc.v. Zoning Board of Appeals, 17 Conn. App. 53, 68 (1988). If the special permit application conforms with the standards, the statutes and the agency's regulations, it must be approved. Id., 56; see also A.P. W. Holding Corp. v. Planning Zoning Board ofAppeals, supra, 167 Conn. 185. The credibility of witnesses is within the province of the administrative agency. Spectrum ofConnecticut, Inc. v. Planning Zoning Commission, supra,13 Conn. App. 163. Torsiello v. Zoning Board of Appeals,3 Conn. App. 47, 49 (1984). The trial court must review the record before the agency to determine whether it has acted fairly or with proper motives or upon valid reasons. Spectrum of Connecticut,Inc. v. Planning and Zoning Commission, supra, 13 Conn. App. 163.
These general rules changed somewhat in 1998. The special permit process is, in fact, discretionary. General considerations such as public health, safety and welfare, which are enumerated in zoning regulations, may be the basis for the denial of a special permit. Before the zoning commission can determine whether the specially permitted use is compatible with the uses permitted as of right in the particular zoning district, it is required to judge whether any concerns, such as parking or traffic congestion, would adversely impact the surrounding neighborhood. Whisper Wind Development Corp. v. Planning ZoningCommission, 229 Conn. 176, 177 (1994); Barberino Realty CT Page 7458Development Corp. v. Planning Zoning Commission, 222 Conn. 607,613 (1992). The Appellate Court has acknowledged that "Connecticut courts have never held that a zoning commission lacks the ability to exercise discretion to determine whether the general standards in the regulations have been met in the special permit process. . . . If the special permit process were purely ministerial there would be no need to mandate a public hearing."Connecticut Health Facilities, Inc. v. Zoning Board of Appeals,29 Conn. App. 1, 6-7 (1992); see also T. Tondro, Connecticut Land Use Regulations (2d Ed. 1996 Sup. ) p. 64.
 "When ruling upon an application for a special permit, a planning and zoning board acts in an administrative capacity . . . . Generally, it is the function of a zoning board or commission to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The [Appellate Court and] trial court had to decide whether the board correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . . In applying the law to the facts of a particular case, the board is endowed with a liberal discretion, and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal." (Citations omitted; internal quotation marks omitted.)
Double I Limited Partnership v. Plan Zoning Commission,218 Conn. 65, 72 (1991).
"Although it is true that the zoning commission does not have discretion to deny a special permit when the proposal meets the standards, it does have discretion to determine whether the proposal meets the standards set forth in the regulations. If, during the exercise of its discretion, the zoning commission decides that all of the standards enumerated in the special permit regulations are met, then it can no longer deny the application. The converse is, however, equally true. Thus, the zoning commission can exercise its discretion during the review of the proposed special exception, as it applies the regulations to the specific application before it." Irwin v. Planning Zoning Commission, 244 Conn. 619, 628 (1998).
 SCOPE OF JUDICIAL REVIEW OF SITE PLANS
CT Page 7459
Defendant Woods, in accordance with the regulations, filed a combined special permit and site plan application, heard and considered by the Commission at the same time. The combined Planning and Zoning Commission of the Town of Greenwich is the agency authorized to act on special permits and site plans. Regulations § 6-13 and 6-17. Regulation § 6-94 (b)(1) contains the use regulations controlling this application. The schedule of required open spaces, limiting heights and bulk of buildings for the RA-4 zone and controlling this application are found in the Regulations § 6-205 and § 6-205 Notes 7(a) and 7(a)(1). The site plan section of the regulations are § 6-13 through § 6-161. The Commission, in acting upon a site plan application, acts in an administrative capacity. Norwich v. Norwalk Wilbert Vault Co.,208 Conn. 1, 12 (1988); Goldberg v. Zoning Commission173 Conn. 23, 29 (1977). The question for the agency and for the Superior Court on appeal is whether or not the application submitted conforms to the applicable regulations. McCrann v. Town Planning Zoning Commission, 161 Conn. 65, 78 (1971); Kosinski v. Lawlor,177 Conn. 420, 427 (1979); Marmah, Inc. v. Greenwich,176 Conn. 116, 118 (1978). A site plan is the entire lan of the documents submitted to the agency to determine whether the proposed building, and use of the structure conforms with the specific provisions of the zoning regulation. SSM Associates LimitedPartnership v. Plan Zoning Commission, 15 Conn. App. 561,567-68 (1998). In reviewing site plans, the Commission has no independent discretion beyond determining whether the plan complies with the applicable regulations. The site plan application must comply with the requirements of the regulations as written. Norwich v. Norwalk Wilburt Vault Co., supra, 208 Conn.
 SCOPE OF JUDICIAL REVIEW OF COMBINED SITE PLAN AND SPECIAL PERMIT
Woods filed a single application with the Commission for combined site plan/special permit approval. The commission accepted the combined application and held a simultaneous public hearing on October 28, 1997. The rules of the Commission and the Building Zoning Regulations permit a dual application. The commission had to review the site plan application under section16-13 through 16-1 of the Building Zoning Regulations and the special permit under section 16-17. Both applications were granted. One decision was rendered by the Commission and one appeal was filed by the plaintiff. CT Page 7460
The scope of judicial review is different as to site plans and special permits. In 1992 the Supreme Court noted: "As such, review of a special permit application is necessarily dependent on a thorough review of the proposed site plan because, in fact, the grant of the special permit is usually contingent upon approval of the site plan." Barberino Realty Development Corp.v. Planning Zoning Commission, supra, 222 Conn. 614. The scope of judicial review in a combined site plan/special permit application is the more rigorous special permit standard. Id., 615; see also SSM Associates Limited Partnership v. Plan ZoningCommission, supra, 15 Conn. App. 568.
 GENERAL RULES OF SCOPE OF JUDICIAL REVIEW
In reviewing the actions of a zoning agency the agency is "endowed with a liberal discretion, and its [actions are] subject to review by the courts only to determine whether [they were] unreasonable, arbitrary or illegal. . . . The burden of proof to demonstrate that the board acted improperly is upon the party seeking to overturn the board's decision. . . . In an appeal from the I decision of a zoning board, we therefore review the record to determine whether there is factual support for the board's decision, not for the contentions of the applicant." Francini v.Zoning Board of Appeals, 228 Conn. 785, 791 (1994); See alsoSchwartz v. Planning Zoning Commission, 208 Conn. 146, 152
(1988). "The question is not whether the trial court would have reached the same conclusion but whether the record before the agency supports the decision reached." Burnham v. Planning Zoning Commission, 189 Conn. 261, 265 (1983).
"Where a zoning agency has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . . Under this traditional and long-standing scope of review, the proper focus of a reviewing court is on the decision of the zoning agency and, with regard to its factual determinations, on the evidence before it that supports, rather than contradicts, its decision." (Citation omitted; internal quotation marks omitted.) Caserta v.Zoning Board of Appeals, 226 Conn. 80, 86-87 (1993); See alsoMarmah, Inc. v. Greenwich, supra, 176 Conn. 118. "An administrative appeal `shall be confined to the record.'" Blakerv. Planning Zoning Commission, 219 Conn. 139, 146 (1991); See CT Page 7461 General Statutes § 4-183 (i). The court must determine whether the conclusions reached by the agency are supported by the record. Goldberg v. Zoning Commission, supra, 173 Conn. 27.
In evaluating whether the conclusions reached by the agency meet the substantial evidence rule, the credibility of witnesses is a matter within the province of the agency. Huck v. InlandWetlands Watercourses Agency, 203 Conn. 525, 539-40 (1987). Administrative findings are supported by "substantial evidence" if the record affords a substantial basis of fact from which the fact in issue can reasonably be inferred. Huck v. Inland Wetlands Watercourses Agency, supra, 203 Conn. 541. The question is not whether the trial court would have reached the same conclusion, but whether an examination of the record shows that the agency's ultimate findings were supported by substantial evidence. Norwichv. Norwich Fire Fighters, 173 Conn. 210, 214 (1977). The "substantial evidence rule is similar to the "sufficiency of evidence" standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Internal quotation marks omitted.)Persico v. Maher, 191 Conn. 384, 409 (1983).
The interpretation of the provisions of an ordinance is a question of law for the court. Danseyar v. Zoning Board ofAppeals, 164 Conn. 325, 329 (1973); Park Regional Corp. v. TownPlan Zoning Commission, 144 Conn. 677, 684 (1957). The court determines whether the agency correctly interpreted the regulation and applied it with reasonable discretion based upon the facts presented. Thorne v. Zoning Board of Appeals,156 Conn. 619, 620 (1968). The court determines the legislative intent from the language used in the regulation. Weigel v. Planning ZoningCommission, 160 Conn. 239, 246 (1971). "[Z]oning regulations and ordinances, being in derogation of common law, must be strictly construed and not extended by implication. . . . These regulations must be interpreted in accordance with the ordinary rule of statutory construction that, where the language of the statute is clear and unambiguous, courts cannot by construction read into the statutes provisions which are not clearly stated. . . . In addition, words employed in zoning ordinances are to be interpreted in accord with their natural and usual meaning." (Citations omitted.) Schwartz v. Planning ZoningCommission, supra, 208 Conn. 153; See also Harlow v Planning Zoning Commission, 194 Conn. 187, 193 (1984). This court must determine as a matter of law whether under the facts presented in CT Page 7462 the record, the assisted living facilities proposed by Woods meet the definition of "homes for the aged," under Regulations § 6-94 (b)(1). "If . . . the [zoning] commission construed [the regulations] beyond the fair import of its language, then the [zoning] commission acted in an arbitrary and illegal manner.Double I Limited Partnership v. Planning Zoning Commission
supra, 218 Conn. 72.
 PROCEDURAL HISTORY OF APPLICATIONS
The Commission's written decision, (Return of Record, Exhibit 52), is detailed and outlines the factual history of the neighborhood and the zoning regulations. The subject property is located in the RA-4 zone, which permits as its principal use, single family dwellings, no more than one per lot, with a minimal lot size of 4 acres. All residential zones in Greenwich from the R-12 (12,000 square feet) through and including the RA-4 zone, contain the same list of uses that may be authorized by the Zoning Board of Appeals as special exceptions. These uses have been in the zoning regulations since its September 1947 amendment. Nursing homes and homes for the aged were special exception uses in all these larger residential zones. On March 28 1992 the regulations were amended to the current § 6-94 (b)(1), thus removing "homes for the aged" and "nursing homes" from the special exception category authorized by the Planning 
Zoning Board of Appeals to special permits authorized by the Commission. The special permit rule in the RA-4, RA-2, RA-1, R-20, and R-12 zones allows the uses enumerated in the Regulations, "when authorized by the Planning and Zoning Commission by Special Permit issued pursuant to Section 6-17." Regulations § 6-94 (b)(1).
The last amendment to the Regulations on February 8, 1994 was a simple renumbering. The use section of the Regulations, § 6-94 (b)(1), now reads: "Hospitals; clinics; nursing homes; homes for the aged; sanitariums; convalescent homes, or other health care facilities for the elderly; philanthropic or charitable institutions not of a penal or correctional nature nor for the care of insane or feeble-minded patients; provided that any building so permitted shall be located not less than one hundred (100) feet from any street or lot line unless the Commission finds in consideration of the particular use and its specific location that a lesser distance will protect adjacent property owners from adverse impacts." Regulations § 6-94 (b)(1). CT Page 7463
This has remained the language of the Regulations since March 28, 1992. The special permit regulations in § 6-17 Greenwich Building Zone Regulations have remained unchanged since its last amendment on June 11, 1986. Site plan approval requirements of the Planning and Zoning Commission under § 6-13 through § 6-16. have remained unchanged since June 16, 1986.
Defendant Woods first received site plan/special permit approval for a 150 bed nursing home on 11.284 acres in application #987 issued by the Commission in 1986. The approved facility had a floor area ratio (FAR) of 0.1438, less than the maximum FAR of 0.15 for the RA-4 zone. The 150 bed nursing home was constructed in accordance with the site plan and special permit, and has been in operation ever since.
On September 18, 1990, the Commission approved Woods' application #1440, for site plan/special permit for an additional 60 nursing beds. Woods provided the required additional 4.6+ acres. This new site plan/special permit approval involved 15.893 acres. The 4.6+ acres were encumbered by conservation easements, rights for access and the installation of utilities including a septic system, if necessary. The additional 60 nursing beds were constructed after the 1990 approval. Upon completion, the existing 210 bed nursing home was located on 15.893 acres in one 96,108 square feet building. The FAR approved on September 18, 1990 was 0.1388, less than the maximum FAR for the RA-4 zone of 0.15.
On August 28, 1992, the Commission adopted a zoning amendment to § 6-205 which changed the maximum FAR for special permit uses under § 6-94 (b)(1) on sites in the RA-4 zone. The new FAR was reduced from 0.15 to 0.10 on lots in excess of 8 acres, but less than 25 acres. In addition, the amendment required a minimum separation distance of 2500 feet between special permit uses permitted under § 6-94 (b) and § 6-94 (b)(1). The August 28, 1992 amendment contained a grandfather provision: "Any use existing as of the date of this amendment, which may become nonconforming as to the above distance requirement by the adoption of this amendment, the non-conforming use will not be prohibited from being continued, altered, changed, or expanded, provided all other standards of the Building Zone Regulations were complied with." Regulations § 6-94 (b).
On August 28, 1992 Woods became legally non-conforming in two regards. First, as to the total FAR on the 15.893 acres site that CT Page 7464 had been granted site plan/special permit approval in application #1440; second, as to the minimum 2500 foot separation distance between another existing special permit use on King Street, i.e., the Greenwich Laurelton Nursing Home.
On August 9, 1996 Woods filed application #1440.1 containing three requests: (1) site plan approval for a proposed assisted living facility; (2) special permit approval for the assisted living facility; and (3) an amendment to the definition section of the Regulations, § 6-5 (a), including the addition of "Assisted Living Facility" along with adding this use to the special permit portion of the regulations in the RA-4 zone in § 6-94 (b)(1). Woods intended to construct a new building located on an additional 4.493 acres which were not included in the 1990 site plan/special permit application #1440. A new, two story, 28,722 square feet building would be constructed, consisting of 32 units of "assisted living residence." This new building would be a separate structure from the existing 210 bed nursing home.
Contemporaneously, two similar applications were also filed for two other Greenwich properties located on King Street to the north of the subject premises. The first was filed by Marriott Brighton Gardens for 115 units of "assisted living facility," application #1841. The second was filed by Liberty Health Care, a.k.a. National Assisted Living, for 54 units of "assisted living facility," application #1837. Both filed simultaneous requests for a new regulation covering the entire Town of Greenwich devoted to "assisted living facilities." Woods application #1440.1 was different in two regards. First, it was filed in accordance with the 1992 grandfather clause regarding the 2500 foot distance separation; second, it contained a simple definitional change of an additional use in § 6-94 (b)(1) entitled "assisted living facilities." Thus, the Woods proposed amendment did not affect all properties in the Town of Greenwich, while the other two assisted living applications did.
It appears that all three applications were assigned for public hearings on various dates before the Commission. The Commission considered all three applications, in the order of filing, on the same public hearing dates, including October 1, 1996 and October 22, 1996. The record of the public hearings for the Marriott and Liberty applications are not part of the Woods return of record. The transcript of the public hearings for the two other applications are also not part of the Woods return of record considered by this court or by the Commission. CT Page 7465
After multiple continuances, and some amendments to the proposed zone change by Liberty, all three applications were denied by the Commission on February 11, 1997. There is no record of any appeal taken from any of these decisions. Woods did not appeal from the denial of its amendments to the zoning regulations. Prior to February 17, 1997, Woods withdrew its site plan/special permit application #1440.1. It is unclear on the record whether the Marriott and the Liberty special permit use applications were withdrawn and/or denied. In any event, due to the denial of the amendments, the Commission had no authority to approve the Marriott and/or Liberty applications as filed.
The Commission considered its own amendments to the zoning regulations. A proposed text amendment, #Am 97-3, was submitted by the staff of the Commission regarding "assisted living facilities." The Commission held a public hearing on that proposal on July 29, 1997. The public hearing was closed on July 29, 1997. The Return of Record does not indicate what, if any, action the Commission took on its own proposal. This text amendment was pending when Woods filed its application #1440.3 on August 7, 1997. This appeal was presented to the court on the basis of the regulations as they existed on August 7, 1997, without any action by the Commission on text amendment #Am 97-3. Both #Am 97-3 and Woods application #1440.3 were scheduled for a final decision on December 9, 1997. The Woods application was approved and duly published. There is no record of any action by the Commission on #Am 97-3, nor any publication of any Commission action on its own zoning amendments (Return of Record, Exhibit 51).
Later in 1997, Woods applied to the Commission to amend its prior site plan/special permit approval to increase the beds in the existing nursing home. It was granted on an administrative basis as application #1440.2. The addition of 7 skilled nursing beds within the existing facility brought the total to 217 beds. This did not require an increase in the gross floor area or any change in the existing building envelope. It did not intensify the degree of non-conformity of the existing facility with respect to the FAR, nor violate the 2500 foot separation rule between special permit uses under § 6-94 (b). No appeal was taken from that decision.
On August 7, 1997, Woods, pursuant to § 6-94 (b)(1), § 6-94 (b) and the non-conforming sections of the Regulations, § 6-141 CT Page 7466 (b)(1), filed a final Site Plan and Special Permit application. No amendments to the Regulations were filed. The application sought to add a new, one story building on the 4.493 acres, for 29 units of "assisted living" in a new 19,508 gross square foot building. This application included the entire tract of land owned by Woods, i.e., the existing 217 bed nursing home on 15.893 acres and the new "assisted living" building on 4.493 acres containing 23 studio units, 3 one bedrooms units, and 3 two bedroom units ranging in size from 353 to 600 square feet. Each assisted living unit had a sink and a refrigerator, but no stove. Twenty-five new parking spaces would be constructed. The common area would include a dining room, craft, exercise and recreational areas, medical facilities, and an outdoor wander garden. The driveway would access directly to the new building from King Street. There would be an internal driveway access to the site by a connecting drive from the nursing home. The existing dwelling and a barn on the 4.493 acres would be razed.
The FAR for the existing 217 bed nursing home and the new 29 unit "assisted living facility" would be 0.124. A total of 110,248 square feet in two buildings would be located on the 20.393 acres. As of September 1997, Woods had a legally non-conforming FAR of 0.1388 on its 15.9 acres nursing home section. As proposed, including the new building, the FAR would be reduced to 0.124.
Woods had incorporated by reference in its submission to the Commission the entire record of application #1440.1. Without objection, the record at trial was supplemented by this information since it was too large to include in the initial Return of Record. The Commission considered application #1440.1, and this current application, #1440.3, in its decision making process.
A public hearing was held on October 28, 1997 with due notice. The application was approved by the Commission on December 9, 1997, and notice of that decision was published in the Greenwich Time on December 17, 1997. The plaintiff served his appeal on December 31, 1997. No party has claimed that these actions violated any statutory requirements.
Three issues are raised in this appeal. They are stated in page 2 of this Memorandum of Decision. No other issues were briefed by the parties. No other issues were argued before the court. Any other legal issues have been considered abandoned. CT Page 7467Shaw v. Planning Commission, 5 Conn. App. 520, 525 (1985); See also Ierardi v. Commission on Human Rights Opportunities,15 Conn. App. 569, 585 (1988). The three issues presented by the plaintiff and briefed by the defendants must be considered. I.R.Stich Associates, Inc. v. Town Council, 155 Conn. 1, 3 (1967).
 THE WOODS' APPLICATION MEETS THE DEFINITION OF "HOMES FOR THE AGED" CONTAINED IN § 6-94 (b)(1) OF THE BUILDING ZONE REGULATIONS
The first issue is whether or not the Commission erred in allowing the approval of the site plan/special permit under § 6-94 (b)(1). The Commission denied an amendment to the regulations that specifically provided for an "assisted living facility." In this decision, the Commission found that the applicant's 29 units of "assisted living" was a "home for the aged," a permitted use in the RA-4 zone. "WHEREAS, the Commission finds that units with assisted living services qualifies as a form of "homes for the aged" under section 6-94 (b)(1) of the Regulations" (Return of Record, Exhibit 52, p. 6) No prior decision had been rendered by any Greenwich zoning agency concerning whether or not an "assisted living facility" is a "home for the aged" under § 6-94 (b)(1).
The plaintiff claims that this application is an attempt to break the RA-4 zone by constructing multi-family units, a use not permitted in any of the larger zones in Greenwich: R-12, R-20, RA-1, RA-2 and RA-4. The plaintiff further claims that the applicant does not meet the requirements of the State Health Department Regulations regarding "assisted living facilities." Woods claims that the "assisted living facility" is an adjunct to the type of uses delineated in the current regulations. These permitted uses have existed for over fifty years. The application meets the continuum of care anticipated by the legislative intent of those regulations.
More than half of the plaintiff's five page brief in support of this appeal is devoted to the argument that the Woods' application does not meet the definition of "assisted living" contained in General Statutes § 19a-490, as to licensing of healthcare institutions and the state regulations promulgated in this same area. The plaintiff has attached to his brief, Section19-1 3-D 105 of the Regulations of Connecticut State Agencies entitled, "Assisted living services agency." The record shows that prior to its zoning application, Woods obtained a license CT Page 7468 from the State of Connecticut to operate an assisted living services agency facility at the site and this fact was set forth in the Commission's decision. "In March 1997, the applicant was granted a license to operate on the subject site an Assisted Living Services Agency (ALSA) facility by the State of Connecticut office of Health Care Access." Return of Record, Exhibit 52, p. 4.
The plaintiff claims that the Commission committed error in relying on this license since the statute and state regulations only apply to services, not the construction of a new building. By state regulations, "assisted living services" are defined as "nursing services and assistance with activities of daily living provided to clients living within a managed residential community having supportive services that encourage clients primarily age fifty five (55) or older to maintain a maximum level of independence." Regs., Conn. State Agencies § 19-13-D105(a), definitions (2). The plaintiff argues that these services must be contained within a "managed residential community" within § 19-13-D105(e)(2). A "managed residential community" is a "facility consisting of private residential units not provide a managed group living environment, including housing and services primarily for persons aged fifty-five (55) or older" Regs., Conn. State Agencies § 19-13-D105(a)(13). Other sections of the state regulations were cited by the plaintiff to demonstrate that under state regulations "assisted living" is in reality a "private residential unit."
The plaintiff then points to General Statutes § 19a-490 (c), the licensing statute for "homes for aged." Under that definition section, a home for the aged is defined as "an establishment which furnishes, in single or multiple facilities, food and shelter to two or more persons unrelated to the proprietor and, in addition, provides services which meet a need beyond the basic provisions of food, shelter and laundry."
To conclude his argument, the plaintiff states that the Woods' plan "shows the facility prepared by Greenwich Woods is nothing but 29 separate apartments, some studio, some 1 bedroom, some 2 bedroom. This is a managed residential community . . . consisting of private residential units (ALSA Regs. (a)(13)) belonging to a tenant[(a)(15)] and not a home of the aged. What the commission has allowed is a multiple residential facility in an area where single family residences are permitted on four acres or more." It is for this reason that Woods originally CT Page 7469 applied to amend § 6-94 to include an assisted living facility as a special permit use since the applicants themselves did not believe the Commission had authority under the "homes for the aged" regulations to approve this project.
The plaintiff's argument is not persuasive for a number of reasons: (1) the Commission did not adopt the state regulations as part of its zoning regulations; (2) the Commission is not bound to apply state regulations in the interpretation of its own zoning regulations, drafted by the Commission, not the state agency; (3) nothing in the state regulations preempts the application of local zoning regulations, for example in the case of Connecticut Siting Council. General Statutes § 16-50x(a); (4) the plaintiff's position is nothing more than a "character of neighborhood" argument dressed in state regulatory rules; and (5) the fact that Woods meets the state regulatory definition of assisted living services agency and managed residential community, does not mean that it cannot at the same time be a "home for the aged" under the Greenwich Building Zone Regulations.
The plaintiff's argument that the proposal is nothing more than a private multi-family building is belied by the very state regulations cited in his brief. Woods, by state regulations, is required to provide: (a) emergency call systems in each unit; (b) a 24 hour security program; (c) regularly scheduled meals service for three meals per day; (d) regularly scheduled off premises transportation; (e) programs of social and recreational opportunities; (f) common space sufficient to accommodate half of the occupants; (g) an on site services coordinator who has a social worker/human services degree; (h) office space in sufficient size to have conferences with clients and their families; (i) sealed client service records; (j) a supervisor of the assisted living facility who is a registered nurse; (k) provision of nursing services; (I) supervision of medication administration by a nurse, or with the approval of the client, by an assisted living aide; and (in) detailed duties of assisted living aid concerning client's personal hygiene, ambulation and routine household services essential to client care at home.
The Regulations do not contain a definition of "nursing home," "convalescent home," or "homes for the aged." There is no requirement of minimum age in the zoning regulations for the occupants of such facilities, nor do the regulations delineate the improvements to be found in such facilities. As a matter of CT Page 7470 law, could the Commission conclude that the "assisted living facility" as proposed was a "home for the aged" under § 6-94 (b)(1)? The answer is yes. None of the units had a full kitchen. There was no stove. Under § 6-1 a stove is an essential ingredient to establish a separate living unit. All residents eat in a central dining area. Medical assistance is provided and common activities are planned. Medical offices are located on the premises. The minimum age for residents is 55 and no children are permitted. Therefore all occupants would be eligible for AARP membership as of the 1997 application and the one time $250,000 per person exemption from federal capital gains on the sale of their principal residence. Section 19-13-D105 of the Regulations of Connecticut State Agencies established fifty five (55) as the occupying age. Age fifty-five (55), as a matter of law, is "aged" under the Building Zone Regulations of the Town of Greenwich. A Group Living Facility for the Elderly (60 years or older) is defined in Regulations § 6-5 (26.1). Such a use was added to the Greenwich Building Zone Regulations on February 25, 1988 to an entirely different section of the Regulations, i.e., § 6-94 (b)(2). Neither the Commission nor the court is bound by the "60 years or older" limitation when interpreting "homes for the aged." No other age limitation is referred to in the Building Zone Regulations.
The uniqueness of Woods' use compared to that of the other two zone change applications is also a factor, which the Commission noted in its decision. Woods' "assisted living facility" is adjacent to an existing skilled/intermediate care nursing home. The other two applications would not be connected with any other care facility. Woods is serviced by public water and the other two applications were not. The other two applications required a septic system. Woods is connected to and serviced by the Westchester County public sewer system.
In addition, "assisted living" does not have a specific definition within the care industry. The record shows the differing levels of care. Skilled nursing facilities require around the clock care in the existing nursing home. An intermediate care facility requires less care. Even less care is required in an "assisted living facility." In such a facility all meals are prepared and served at a central location. Each resident can function without constant care. Some residents will use their own motor vehicles. Other residents would be provided transportation and medication. Nursing facilities are available. The next lower level would appear to be congregate housing. Some CT Page 7471 common social areas would exist but there would be no other care, transportation, medical facilities, medication, or physical therapy. The lowest level of group living would be an apartment house, condominium or co-operative.
The return of record contains comments by Sue Lobel made during the public comment period. She has been employed in the assisted living profession for four years. Apparently, Ms. Lobel's appearance at the public hearing was not requested by either party. She stated, "Assisted living is really considered housing with services. . . . It is housing. However they provide services for people, dressing, grooming and bathing. As far as being very medical, they try to keep it as a social model and not medical. Medical services are generally provided outside from outside agencies, as they would be if someone was living in their home." When asked by a member of the Commission what the difference between a continuing care facility and this is, Ms. Lobel responded: "Continuing care has three components to it. Generally speaking, people move into it when they're independent and they generally provide one meal a day. People who are independent or still driving, they have complete kitchens. They do some of their own cooking. They have one meal a day provided for them. As they age in continuing care communities, the next component would be assisted living. People are able to move in assisted living if they need to. If they need medical needs, there are skilled nurses available. . . . Assisted living is the middle range of that continuing care community. Assisted living is growing around the country."
The Return of Record also contains a letter from the Town of Greenwich Commission on Aging dated September 9, 1996 which notes the flexibility required when dealing with facilities for the aged. "In analyzing proposed zoning regulations it should be kept in mind that assisted living is an evolving concept. The Commission on Aging is unable, at this time, to foresee the direction in which this concept will develop. We support the concept but nevertheless believe that zoning regulations should not be so narrowly drawn so as to preclude the Planning and Zoning Commission from being able to approve future applications." (Defendants Exhibit 1, Site Plan/Special Permit No. 1440.1).
The Commission on Aging attached to that letter a document entitled, "Assisted Living Report". The report stated under DEFINITION: "There is no standard or uniform definition of CT Page 7472 assisted living. Moreover, the term itself is not used uniformly throughout the U.S. In some communities, it is described as residential care, congregate care or personal board and care."
The Assisted Living Federation of America, a trade organization, defines an "Assisted Living residence" as "a special combination of housing, personalized supportive services and healthcare designed to meet the needs — both scheduled and unscheduled-of those who need help with activities of daily living." http://www.alfa.org/WhatsAL.htm, February 1, 1999, Page 1. "Regulations and licensing regulations vary from state to state contributing to a wide range of senior housing models considered Assisted Living." http://www.alfa.org/WhatsAL.htm,
February 1, 1999, Page 2. "Services provided in Assisted Living residences usually include: Three meals a day served in a common dining area, Housekeeping services, Transportation, Assistance with eating, bathing, dressing, toileting, and walking, 24-hour security and staff availability, Emergency call systems for each resident's unit, Health promotion and exercise programs, Medication management. Personal laundry services and Social and recreational activities." http://www.alfa.org/WhatsAL.htm
February 1, 1999, Page 2.
On September 14, 1998, the Internal Revenue Service released a Revenue Ruling that addresses how assisted living facilities can be financed with tax exempt bonds. The Revenue Ruling defines "residential rental property" for purposes of IRS tax exempt bond rules. The Revenue Ruling states that a healthcare facility is not residential rental property, if a facility makes available continual or frequent nursing, medical or psychiatric services. This September 1998 Revenue Ruling overruled an October 1977 private letter ruling that had focused on whether the assisted living facility was licensed as a healthcare facility under state law. Unlike the October 1997 private letter ruling the new Revenue Ruling focused on the nature and degree of services provided to tenants.
The ruling covered three different residential facilities by way of example, holding that only the last, "Building X," qualified as assisted living. The Revenue Ruling considers whether each of three buildings is residential rental housing. Each of the buildings is composed of similarly constructed housing units that have separate and complete facilities for living, sleeping, eating, cooking, bathing, and sanitation. Basic services available to the residents in all three buildings CT Page 7473 include: laundry; housekeeping; regular daily meals in common dining areas; 24 hour monitored emergency call service; planned social activities; and scheduled transportation to various sites in the vicinity, including hospitals and doctor's offices.
In "Building X" only basic services are made available. In "Building Y," significant additional support services are made available to residents, including: assistance by medication management technicians in medication management and intake; maintenance of detailed medication records; consultation with a nurse as needed about health concerns and medication plans; assistance by non-medically certified aids each day during waking hours in activities of daily living that include getting in and out of bed and chairs, walking, using the toilet, dressing, eating, and bathing; and routine checks by staff members of Building Y to insure the residents' general well-being. The ruling concludes that both Building X and Building Y are residential rental property, because continual or frequent nursing, medical, or psychiatric services are not made available.
In Building Z, however, continual or frequent nursing, medical or psychiatric services are made available to residents. In addition to the support services provided in Building Y, Building Z is staffed in the following manner: registered nurses are on duty for 12 hours each day; licensed practical nurses are on duty 24 hours each day; and licensed nurses' aides are available 24 hours each day. The ruling concludes that Building Z is not residential rental property.
The Woods application is the equivalent to Building Z. Furthermore, it is immediately adjacent to the skilled nursing facility. Finally there are no full kitchen facilities. The September 14, 1998 Revenue Ruling supports the Commission's decision.
There are no appellate or trial court cases in Connecticut that define an assisted living facility. No appellate court case has used the phrase "assisted living." The first mention of assisted living by a Connecticut trial court noted the three levels of care referred to by Sue Lobel in her testimony before the Commission. See Marriott Retirement Communities, Inc. v.State of Connecticut, Superior Court, judicial district of Danbury, Docket No. 30 28 83 (September 24, 1992, Fuller, J.) (7 C.S.C.R. 1170) (Nursing home, assisted living units and independent living units as part of one frill service retirement CT Page 7474 community in Danbury); Guliuzza v. Town and CountryTransportation, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 025902 (October 17, 1984, Rush, J.) (Plaintiff injured in an automobile collision needed assisted living support for the remainder of his life due to his loss of cognitive functions, loss of adoptive functions, inability to work, post-traumatic epilepsy, attention deficit disorder and hyperactivity); Re Sarah Ann K., Superior Court, judicial district of Middletown (January 29, 1997, Foley, J.) (Katie Blair House is a shelter for women and children offering assisted living programs for mothers); Federal Deposit Ins. Co. v. DelcoDevelopment, Superior Court, judicial district of New Haven at New Haven, Docket No. 303743, (March 14, 1997, Hodgson, J.) (Highest and best use of property was for an assisted living facility, which would require the issuance of a special permit under Hamden's new "assisted living" zoning regulations); B GAssociates v. Zoning Board of Stamford, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 151019 (March 20, 1997, Kavanewsky, J.) (Amendment to Stamford zoning regulations to add assisted living residence to special exceptions entitled senior Housing and Nursing Home Facility Complex); Woodbridge Care v. Englebrecht Griffin, Superior Court, judicial district of Waterbury, Docket No. 396811 (March 27, 1997, Hodgson, J.) (Suit by an architect who specialized in assisted living projects involving an Marriott assisted living facility); Woodbridge Care v. Woodbridge Town Plan ZoningCommission, Superior Court, judicial district of New Haven at New Haven, Docket No. 396608 (May 2, 1997, Blue, J.) (Zoning appeal by competitor of an assisted living facility); Milazzo v.Milazzo, Superior Court, judicial district of New Haven at New Haven, Docket No. 377438 (September 9, 1997, Munro, J.) (Creation of an assisted living environment caused by traumatic brain injury, an inability to work and to live independently. Mr. Milazzo required (1) a one-floor living environment; (2) retrofitting for the bathroom and kitchen for ease of use; (3) assistance for several hours each day by a personal care attendant. Absence of these services would require admission to an institution).
The plaintiff must show that the Commission's application of the "homes for the aged" use under § 6-94 (b)(1) to Woods assisted living proposal was beyond the reasonable discretion of the Commission and that the Commission acted illegally and arbitrarily. E.M.J. Corp. v. Zoning Board of Appeals,154 Conn. 667, 669 (1967); Abrahamson v. Zoning Commission, 143 Conn. 211, CT Page 7475 214 (1956). The Commission is endowed with a liberal discretion in interpreting its own regulations. Double I Limited Partnershipv. Planning Zoning Commission, supra, 218 Conn. 75 ConnecticutSand Stone Corporation v. Zoning Board of Appeals, supra,150 Conn. 442. Based on the record before the Commission this court concludes that the Commission could have reasonably interpreted that "homes for the aged" applied to Wood's application. Starr v.Board of Zoning Appeals, 140 Conn. 241, 243 (1953); Whittaker v.Zoning Board of Appeals, 179 Conn. 650, 654 (1980); Pascale v. Zoning Board of Appeals, 150 Conn. 113, 117 (1962).
As can be seen from within the record, there is no clear cut definition in the care industry of an assisted living facility. This is supported by this court's research. It cannot be error for the Commission, under those circumstances, to decide that this application, based on the nature and limitations of the proposed use, and its connection with an existing nursing home that provides both skilled and intermediate care services, was appropriate to be located in the RA-4 zone at this location on King Street. The commission properly exercised its judgment that Woods proposal fits the existing regulations as a "home for the aged."
 THE 29 ASSISTED LIVING UNITS WOULD NOT VIOLATE THE ESTABLISHED RURAL RESIDENTIAL CHARACTER OF THE RA-4 ZONE
The Commission was clearly familiar with the entire neighborhood. The description of the neighborhood is incorporated in its December 9, 1997 decision. The Commission is well aware of the effect of Westchester County's development on the RA-4 zone and the resulting lack of new single family home construction in the neighborhood. The other developments shown in the record do not support the plaintiff's claim that this area of King Street has an "established rural residential character." In any event, the use requested by Woods is a permitted use in the RA-4 zone and is in accordance with the plan of development.
The use must also be in scale with and compatible with surrounding uses, buildings, streets, and open spaces. The FAR of .15 was changed in 1992 to .10. The record indicates that most of the other institutional buildings in the area were constructed under the old FAR. No evidence indicates what the FAR is on the plaintiff's property. This application has reduced the FAR, making it more compatible with the surrounding uses. A description in the Return of Record the uses on both sides of CT Page 7476 King Street, demonstrate that this "assisted living facility" is compatible with those other mixed uses.
A standard for Special Permits under § 6-17 is that the proposed use "will not materially adversely effect residential uses, nor be detrimental to a neighborhood or its residents, nor alter a neighborhood's essential characteristics." There is nothing in the record to indicate that this use would be anything other than an improvement in the neighborhood. There was no evidence to indicate that it would be detrimental to the neighborhood. The record established that Woods has been a good neighbor to the plaintiff since they have operated the nursing home. Mr. Antonik's statements before the commission indicates that Woods has been a good neighbor. The assisted living units have been substantially scaled down from the first October of 1996 application, reduced from two to one story, 32 to 29 units and 23,000 gross square feet to 19,500 gross square feet. Proof of compatibility with the neighborhood under General Statutes §8-2 has been satisfied.
 WOODS PROPOSAL DID NOT VIOLATE THE NON-CONFORMITY RULES
The Commission properly found that the application did not violate the non-conforming rules under Regulations § 6-141 (b)(1). The first non-conformity issue relates to the FAR. Although, the application exceeds the 0.10 FAR in the RA-4 zone, it was less that the prior FAR. The degree of non-conformity was lessened, not increased. This regulation became effective on August 28, 1992 as Regulation § 6-205, Note 7(a): "In the RA-4 and RA-2 zones, for Special Permit uses specified in 6-94 (b)(1) and for Municipal Uses, the Planning and Zoning Commission may permit an FAR not to exceed .10 in the RA-4 zone on lots in excess of eight acres but less than twenty-five acres, and an F.A.R. not to exceed .10 in the RA-2 zone on lots in excess of 8 acres but less than 25 acres, after consideration of the standards set forth in Sec. 6-15 and 6-17 and, further, after a finding by the Commission that the proposed use would serve a public purpose and that there exists a demonstrated community need for said use, and further that. . . ." The 0.15 FAR was amended in 1992 to 0.10. At the time of that amendment, Woods was operating a conforming 210 bed nursing home, with a FAR of 0.1384. When the new FAR of .10 went into effect in 1992, Woods became non-conforming. Regulations § 6-141 (b)(1) requires that a change in a non-conforming use must not be "more detrimental to the neighborhood than the existing one." Woods' FAR was 0.1384 CT Page 7477 prior to the assisted living facility application, and 0.124 after the application. There is no violation of § 6-141(b)(1). The Commission had sufficient information in the record to conclude that Woods was not increasing the non conformity and that the new application was in compliance with the regulations.
The second non-conformity issue relates to the 2500 feet separation distance requirement from another special permit use. A grandfather clause had been added by the Commission in 1992, which applies to Woods' property at 1165 King Street. This regulation became effective on March 28, 1992 as Regulations § 6-205, Note 7(a)(l), which provides: "No special permit use specified in 6-94(b) shall be closer than 2,500 feet to a use in 6-94(b)(1) as measured from any point along the boundaries of the lot(s), except that any use existing as of the date of this amendment which may become non-conforming as to the above distance requirement by the adoption of this amendment, will not be prohibited from being continued, altered, changed or expanded, provided all other standards of the Building Zone Regulations are complied with." The record reflects a statement by the Commisson chair to that effect. This statement is supportive of the Commission's conclusion that Woods' application complied with the grandfather clause.
A neighborhood description is relevant to the discussion of this issue. King Street runs north-south along the Westchester County, New York and Greenwich, Connecticut border. The zoning is denser and the uses are more intense on the Westchester side. The Greenwich side is all located in the RA-4 zone. No single family homes have been built in the Greenwich section of King Street in the last 30 years. The impact of Westchester County Airport, immediately adjacent to the RA-4 zone, is considerable. Multiple institutional uses have been approved by Greenwich along King Street. The property to the immediate north is occupied by the Convent of Sacred Heart, a well known private elementary/secondary school. Opposite the Convent is the United Cerebral Palsy Rehabilitation Center, a portion of which is located in Rye Brook, New York and a portion in Greenwich. To the north of the Cerebral Palsy property, across King Street from Woods, is the Greenwich Laurelton Nursing Home. Other institutional uses within one mile of the subject site on the east side of King Street, are a private country club, a public golf course, a corporate office facility and a Roman Catholic Church. Woods is one of the few institutional uses connected to public sewer and water. The institutional use in Connecticut CT Page 7478 closest to 1165 King Street is Greenwich Laurelton Nursing Home and in New York is the United Cerebral Palsy Rehabilitation Center. The existing nursing home is closer to both of these uses than the proposed new "assisted living" building. Thus, the application will not further exceed Woods' non-conformity.
The application of the grandfather provision to the 2500 feet separation distance rule finds support in the record. The application for a 29 unit assisted living facility is in compliance with § 6-94(b)(1) and the 2500 foot separation distance exception. The records supports the Commission conclusion that § 6-141 (b)(1) was complied with and that the new FAR and the use of the grandfather clause to the 2500 distance rule was not a change in use "not more detrimental to the neighborhood that the existing use." Regulations § 6-141(b)(1).
The site plans standards under § 6-13 through 6-16.1 have been met. The special permit standards under § 6-17 have been met. The use regulations of § 6-94(b)(1) and the bulk requirements of § 6-250 including notes 7(a) and 7(a)(1) have been met. The non-conforming regulations, § 6-141. have been satisfied. Comments in the Return of Record by the Town of Greenwich engineering department, traffic department, police and fire departments, as well as the detailed review by the staff of the Commission on multiple occasions, indicate that great care and thought was given to this project. The plaintiff has pointed to no section of the record to indicate that there was a violation of any regulation, requirement or statute. The court has examined the record and it supports the Commission's conclusion that the standards for both special permit and site plan have been complied with. The Commission's decision reflects an honest judgment regularly exercised. Connecticut HealthFacilities v. Zoning Board, 29 Conn. App. 1, 9-10 (1992). The Commission properly applied § 6-13 through 6-16, 6-17, 6-94 (b)(1), 6-141 and 6-205 and notes 7(a)(l) through (4) of the Building Zone Regulation. The plaintiff's broad brushed approach is not sufficient to sustain the plaintiff's appeal.
The court finds that the reasons stated by the Commission in its ten page decision were supported by the record. The reasons assigned are pertinent to the considerations that the Commission is required to apply under the Building Zone Regulations of the Town of Greenwich. Zieky v. Town Plan and Zoning Commission,151 Conn. 265, 267-68 (1963). The Commission applied the proper CT Page 7479 standards contained in the Regulations. The Commission correctly interpreted the Regulations and the Commission applied the Regulations with reasonable discretion to the facts contained in the record. Pascale v. Board of Zoning Appeals, supra.150 Conn. 117. The Commission having determined that the application met the use, open space, special permit, site plan and non-conformity standards of the Regulations, this court cannot find that the Commission acted in an arbitrary or illegal manner. Double ILimited Partnership v. Plan Zoning Commission, supra,218 Conn. 72.
For all of the foregoing reasons the appeal of the Plaintiff is dismissed.
So Ordered.
TIERNEY, J. JUDGE OF THE SUPERIOR COURT